IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

KATHERINE A SCHWARZ )
and ROBERT C. MAYNARD, )
                                 )
           Plaintiffs, )     TC-MD 160323N
                                 )
       v. )
                                   )
DEPARTMENT OF REVENUE, )
State of Oregon, )
                                 )
           Defendant. )     **FINAL DECISION**[1]

Plaintiffs appealed Defendant's Notice of Deficiency for the 2011 tax year[2] and Notice of

Assessment dated July 1, 2016, for the 2012 tax year.[3] A trial was held on March 29, 2017, in

the Oregon Tax Courtroom in Salem, Oregon. Plaintiffs appeared on their own behalf.

Robert C. Maynard (Maynard) testified on behalf of Plaintiffs. Tracy Skvarch-Pfannes

(Skvarch) appeared and testified on behalf of Defendant. Plaintiffs Exhibits 1 to 19 for the 2011

tax year, 1 to 16 for the 2012 tax year, and Defendant Exhibits A to K were received without

objection.

## I. STATEMENT OF FACTS

This appeal concerns adjustments to Plaintiffs' 2011 and 2012 Schedule E, reporting

income and expenses associated with a rental unit, and the disallowance of Plaintiffs'

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered August 30, 2017. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] According to Defendant, Plaintiffs' Notice of Deficiency was satisfied on December 28, 2015. (Ans at 1.)

[3] The Notices were issued only to Plaintiff Katherine A. Schwarz. (*See* Compl at 2.) The 2011 and 2012 tax returns at issue were filed by Plaintiff Katherine A. Schwarz and claimed Plaintiff Robert C. Maynard as a dependent. (*See* Def's Ex D, F.)

Schedule A casualty loss for the 2012 tax year, associated with a flood of their house and rental unit.

A. *Plaintiffs' 2011 and 2012 Tax Returns; Defendant's Adjustments; Issues on Appeal*

Plaintiffs' 2011 tax return reported Schedule E income of $11,509 and expenses of: $252 for insurance; $150 for legal and professional fees; $2,597 for mortgage interest; $6,217 for repairs; $3,438 for supplies; $946 for taxes; $2,408 for depreciation; and $3,216 for "other."[4] (Def's Ex D at 9.)  No expense was claimed for auto and travel.  (*See id.*)  Defendant disallowed Plaintiffs' claimed expenses for repairs, supplies, and other.  (Def's Ex C at 9.)

On their 2012 Schedule E, Plaintiffs reported income of $7,200 and only "auto and travel" expenses of $2,287.  (Def's Ex F at 4.)  Plaintiffs' 2012 Schedule A reported a casualty loss of $7,717 based on a "flood to rental."  (*Id.* at 10.)  Plaintiffs reported a reduction of $10,000 in the fair market value of their property due to the flood, from $242,000 to $232,000.  (*See id.*)  Defendant disallowed Plaintiffs' 2012 Schedule E rental expenses and Schedule A casualty loss after Plaintiffs failed to respond with requested substantiation.  (Def's Ex E at 9–10.)

At some point, Plaintiffs retained a bookkeeper who prepared an amended 2012 Schedule E reporting the following expenses: $279 for insurance; $2,864 for mortgage interest; $3,454 for repairs; $1,029 for taxes; $2,070 for utilities; $3,237 for depreciation; and $534 for other.  (Def's Ex G at 9.)  It included a 2012 depreciation schedule listing "improvements" with a cost basis of $12,871 at December 31, 2011, with a note stating "items not allowed as expense on the 2011 return."  (*Id.* at 10.)  There is no evidence that Plaintiffs' 2012 amended return was filed.

/ / /

---

[4] The "other" expenses included $302 for dump fees; $125 for equipment rental; $1,631 for fence repairs; $14 for gardening; and $1,144 for painting and decorating.  (Def's Ex D at 12.)

After this appeal was filed, Plaintiffs and Defendant attempted to reach a resolution of this matter. Skvarch made a detailed review of Plaintiffs' receipts supporting their claimed expenses that were previously disallowed, calculating that they totaled $17,916.11 for the 2011 tax year and $5,893.28 for the 2012 tax year. (Def's Exs I at 4, K at 3.) She determined that all the expenses should be capitalized and depreciated over 27.5 years, with 50 percent of the depreciation constituting an allowable deduction for the rental unit. (*See* Def's Status Report at 1, Jan 18, 2017.) Plaintiffs rejected Skvarch's recommendation, reflected in her status report, and requested trial. (Ptfs' Ltr, Jan 25, 2017.) At trial, Skvarch testified that, in her view, all of Plaintiffs' expenses in 2011 and 2012 stemmed from the house remodel and must be capitalized.

The primary disagreement between the parties concerns whether Plaintiffs' house-related expenses were fully deductible for the year in which they were incurred as repair expenses, or whether they must be deducted over multiple years in the form of depreciation because they are capital expenditures. Plaintiffs stated at trial that they do not stand by the expenses reported in their 2011 and 2012 tax returns. Instead, Plaintiffs provided as exhibits several documents listing their house-related expenses based on categories including "electrical," "tools," "repairs," "labor," "dump," and so forth. (*See* Ptfs' Exs 1, 2, 4 (2011); Ex 2 (2012).)

B.    *Plaintiffs' House and Rental Unit*

Maynard testified that, in 2010, Plaintiffs purchased a house on Meadowlawn in Salem, Oregon. (*See also* Def's Exs D at 9, G at 10.) Maynard testified that the house was approximately 4,000 square feet, with 1,787 square feet downstairs and 2,083 square feet upstairs. He testified that the prior owner of the property was a hoarder so Plaintiffs had to remove a lot of trash from the house. At the time Plaintiffs purchased the house, there was no ceiling over the downstairs, only rafters. Maynard testified that Plaintiffs created a separate

rental unit downstairs, including a separate driveway and entrance. They built a kitchen in the rental unit by expanding an existing kitchenette; installed cabinets and countertops; hung sheetrock; and replaced windows on the side of the house. (*See* Ptfs' 2011 Ex 19 (photographs).) Plaintiffs leased the rental unit beginning in March 2011. (*See* Ptfs' Ex 16 (2011).)

Maynard testified that the house turned out to be a "money pit" with numerous problems, including a leaking roof and flood damage in late 2011 and early 2012. Regarding the flood, Maynard testified that it was due to "hydrostatic pressure" in the ground. He testified that many houses in Salem are affected by hydrostatic pressure, although he did not know that prior to Plaintiffs' flood. Plaintiffs provided a letter from their tenant describing the flood:

> "The flooding was so bad one interior wall had to be replaced along with some wiring and water filled my home and patio with almost six inches of water that seemed to come in waves through my patio door walls and flooring. Couldn't get it out until he put a pump under my bathtub."

(Ptfs' Ex 16 (2011).) Maynard testified that Plaintiffs had to install two pumps in the basement to drain the water. (*See also id.*) He testified that Plaintiffs attempted to clean the carpets using a dehumidifier, but it did not work and they had to replace the carpet and vinyl flooring. Maynard testified that Plaintiffs installed a French drain to address the underlying problem that caused the flood. He testified that other expenses associated with the flood included sheetrock, dump fees, driveway repair, and pipes. (*See* Ptfs' 2012 Exs 3 at 1–10, 4 at 4–5, 16.)

C.     *Plaintiffs' House-Related Expenses*

Maynard testified describing the work completed on the house in 2011 and 2012. He conceded that certain projects were properly classified as capital improvements. During the two tax years at issue, Plaintiffs allocated one third of their utilities to the rental unit and allocated 50 percent of other house-related expenses to the rental unit.

/ / /

1.    *Capital improvements conceded by Plaintiffs for 2011*

Maynard conceded that the work undertaken in January and February 2011 to create the rental unit constituted capital improvements. Plaintiff provided a document listing and itemizing expenses incurred in January and February 2011.[5] (Ptfs' Ex 2 at 1–2.) The items listed total $6,717.04, less $19.95 spent at the MAC store for a computer related purchase. (*See id.*) Plaintiffs provided receipts and invoices supporting the expense items listed. (*See Id.* at 3-35.)

Maynard conceded that expenses associated with creating a new sidewalk to the house were capital expenditures. Plaintiffs reported expenses totaling $1,272.98 for that project and provided receipts and invoices to substantiate the amount. (*See* Ptfs' Ex 4 at 5, Ex 13.) Maynard conceded that several items he previously categorized as repairs should be treated as capital improvements: $175.93 to purchase and install downspouts (Ptfs' Ex 7 at 33); certain painting expenses totaling $53.10 (*Id.* at 36–37); various purchases from Home Depot and Lowes totaling $134.43 (*Id.* at 44, 47–48; *see also* Ptfs' Ex 4 at 4); payments for labor to clean up and prepare the house in February 2011 totaling $840 (Ex 10 at 1); payments for labor to finish sheetrock totaling $180 (Ex 10 at 6); and $557 for a sump pump (Ex 10 at 3).

2.    *Capital improvements conceded by Plaintiffs for 2012*

Maynard conceded that certain expenses associated with the flood were capital expenditures. Specifically, expenses pertaining to the French drain, including a payment of $2,170.49 to Chris Reed on February 24 for labor (Ptfs' Ex 2 at 2, Ex 4 at 5) and a total of $694.89 in various purchases that Plaintiffs previously classified as "repairs" (Ptfs' Ex 2 at 2–4, Ex 5 at 14–18, 20–21, 23–30), for a total of $2,865.38.

---

[5] Plaintiffs provided another list of expenses incurred in January and February 2011 that totaled $17,123.88. (Ptfs' Ex 1 at 1.) The specific expenses listed are: $5,184.48 for labor and repairs; $4,137.85 for materials; $320.00 for dump; $2,904.00 for truck; $281.41 for maintenance; $735.05 for grass and yard; $1,272.98 for rental sidewalk and walkway to house; $592.49 for mandatory electrical for code; $673.21 for tool deduction; and $1,022.41 for five-year depreciation of tools. (Ptf's Ex 1 at 1.) Plaintiffs provided no supporting documents.

Maynard conceded that a payment of $1,373.25 to Jacob Anderson[6] on December 30 for roof repairs should be capitalized. (*See* Ptfs' Ex 2 at 2, Ex 4 at 6.)

Maynard conceded that certain expenses totaling $718.46 and consisting primarily of purchases at Home Depot are properly classified as capital expenditures. (*See* Ptfs' Ex 2 at 3–4, Ex 5 at 31–39.) He conceded a packet of exhibits labeled "improvements" and totaling $1,378.99 are all properly classified as capital expenditures. (*See* Ptfs' Ex 2 at 5–6, Ex 7.)

Maynard conceded that tool purchases identified as "five year" tools and totaling $208.52 should be depreciated over five years. (*See* Ptfs' Ex 9 at 1, Ex 14 (receipts).) He testified that a purchase of $142.76 from Home Depot on June 19 was for "shop tools." (Ptfs' Ex 5 at 41–43.)

3.      *Other house-related expenses for 2011*

Maynard testified that the roof of Plaintiffs' house leaked in 2011, ruining some sheetrock and carpet. He testified that the corner of the roof was rotted, requiring 15 to 20 percent of the roof to be replaced. Maynard testified that Plaintiffs twice hired individuals to fix the roof, but neither individual successfully fixed the roof. Plaintiffs did not separately break out expenses pertaining to the roof repair; rather, the expenses are spread throughout several of Plaintiffs' expense categories. (*See* Ptfs' Ex 4.) Maynard testified regarding which expenses pertained to the roof repair, resulting in a total of $2,640.18.[7] (*See* Ptfs' Ex 4 at 2–4, Ex 7, Ex 10 at 7–8.) Maynard testified that Plaintiffs also took 17 to 19 loads to the dump, some of which were related to the roof repair and some of which were related to the yard. Plaintiffs reported

/ / /

---

[6] The "Statement" detailing the payment and work done identifies "Jacob Anderson," but Maynard's itemized list of expenses identifies "Jacob Abbott." (*See* Ptfs' Ex 2 at 2, Ex 4 at 6.)

[7] That total is based upon general "repair" receipts totaling $4,137.85, less nonroof-related "repair" receipts totaling $1,617.67, plus roof "labor" of $120. (*See* Ptfs' Ex 7 at 1, 10–11, 15–16, 32–33, 36–39, 41–42, 44–48 ("repair" receipts identified by Maynard during trial as unrelated to the roof repair).)

expenses totaling $320 for "dump" fees and provided some receipts.  (Ptfs' Ex 4 at 7, Ex 11.)  It is unclear which receipts pertained to the roof repair.  (*See id.*)

Maynard testified that the bathtub in the rental unit cracked and had to be replaced.  He testified that Plaintiffs had to cut through the wall to remove the existing bathtub.  Maynard identified a payment of $347 for labor as pertaining to the bathtub.  (*See* Ptfs' Ex 10 at 3.)

Maynard testified that a check dated February 15 for $2,153.58 was to repair clogged pipes in the rental unit.  (Ptfs' Ex 3.)  He testified that Plaintiffs incurred other plumbing related expenses: $183.47 to Mr. Rooter to fix backed up plumbing on February 15 (Ptfs' Ex 7 at 1); $194 to ARS Rescue Rooter on August 9 (*Id.* at 15–16); and $22.24 to George Morlan Plumbing Supply on December 2 (*Id.* at 38–39).

Maynard testified that Plaintiffs had to make additional electrical repairs to bring the house up to code, for expenses totaling $1,468.16 for an electrician and related supplies. (Ptfs' Ex 4 at 1, Ex 5, Ex 7 at 32, Ex 10 at 5.)  Plaintiffs provided receipts and invoices dated in March, October, November, and December.  (*See id.*)

Maynard testified that Plaintiffs planted a new lawn at the house because the original yard was a "mud pit."  They reported expenses totaling $735.05 for "grass/yard" in May and June, but did not provide any receipts to substantiate those expenses.  (Ptfs' Ex 4 at 9.)  Maynard testified that payments to three individuals named "Clinton, Cameron, and Tony" totaling $872 was for their work to clean up the yard, including removing five cords of rotted wood and concrete blocks.  (*See* Ptfs' Ex 10 at 4 (statement dated December 5).)

Maynard testified that Plaintiffs paid $432.41 for paint because their tenant wanted a different color.  (Ptfs' Ex 4 at 6, Ex 8.)  Plaintiffs provided receipts related to paint expenses dated in March, April, and October.  (*See id.*)

Maynard testified that Plaintiffs paid $483 to replace the furnace in the rental unit. (Ptfs' Ex 7 at 42.) They provided a service work order dated December 31. (*Id.*)

Maynard testified that expenses totaling $37.05 were for general maintenance. (Ptfs' Ex 7 at 45–46.) They provided invoices from Miller Paints dated December 20 and 22. (*Id.*)

Maynard testified that expenses totaling $1,770.76 were for tools including a tiller, drills, and a sander. (*See* Ptfs' Ex 4 at 1, Ex 6.) He paid $44.97 for saw blades. (Ptfs' Ex 7 at 41.) Maynard agreed that most of the tools should be depreciated over five years. Plaintiffs provided receipts and invoices from April through December. (*See id.*)

Plaintiffs reported spending $2,192.67 on items related to the fence. (Ptfs' Ex 4 at 4–5.) Maynard testified that those expenses were for maintenance and not deducted. Plaintiffs did not provide any receipts or invoices substantiating their fence expenses and made a note stating "not counted" with respect to some of the expenses. (*See id.* at 4.)

Plaintiffs reported spending $2,904.71 on their "work truck" and provided receipts and invoices to support that amount. (Ptfs' Ex 4 at 8-9, Ex 12.) Plaintiffs' truck is a 1978 pickup truck. (*See* Ptfs' Ex 12 at 1–2.) Maynard testified that Plaintiffs used the work truck only in association with the house. Plaintiffs did not provide a log or other similar record detailing their use of the truck.

Plaintiffs provided a one-page document pertaining to their utilities. (Ptfs' Ex 17.) It states $1,346.11 paid for Natural Gas and $1,876.68 paid for PGE. (*Id.*) Plaintiffs provided no receipts or statements supporting those total amounts.

4.      *Other house-related expenses for 2012*

Maynard testified that Plaintiffs incurred expenses to rent air compressors, jackhammers, and other similar equipment to repair flood damage, and provided receipts and invoices totaling

$1,038.23 for those rentals. (*See* Ptfs' Ex 2 at 1, Ex 3.) Maynard testified that Plaintiffs paid for labor to repair flood damage and provided receipts and invoices totaling $3,838.14. (*See* Ptfs' Ex 2 at 2, Ex 4 at 1–5.) The first receipt for $375 was for electrical work. (Ptfs' Ex 4 at 1.) The second receipt for $1,225 is unclear with respect to the specific work performed because the handwriting is illegible. (*Id.* at 2.) The third receipt for $2,145.92 included a summary of work performed: "excavation of driveway, repair wall as needed (multiple areas damaged), demolition and repair of damages inside rental (lower floor), removal of debris, replace driveway." (*Id.* at 4; *see also* Ptfs' Ex 2 at 2.) Maynard testified that certain expenses consisting primarily of purchases at Home Depot and totaling $1,048.72 were repair expenses related to the flood. (*See* Ptfs' Ex 2 at 2–3, Ex 5 at 1–13, 16–19, 22–24.) The receipts were dated from January 2 through February 5. (*See id.*) Maynard testified that a payment to Salem Mobile Mix on February 7 for $719 was to fix a crack in the foundation, related to the flood. (*See* Ptfs' Ex 16.)

Maynard testified that certain expenses totaling $1,630.88 were for repairs and maintenance. (*See* Ptfs' Ex 2 at 3–5; Ex 5 at 19, 22, 29, 44, 45; Ex 6; Ex 14 at 4.) Plaintiffs provided receipts and invoices to substantiate those expenses. (*See id.*) The nature of the purchases is not entirely clear; some pertain to the deck and yard improvements. (*See id.*)

Maynard testified that Plaintiffs' purchases, totaling $39.34, were for "one year disposal" tools. (*See* Ptfs' Ex 9 at 1.) He testified that a $30 payment for "power cord repair/labor" on March 1 was for tool repair. (*See* Ptfs' Ex 5 at 10.)

Plaintiffs provided a one-page document pertaining to their utilities. (Ptfs' Ex 10.) It states $1,036.11 paid for Natural Gas and $2,236.63 paid for PGE. (*Id.*) Plaintiffs provided no receipts or statements supporting those total amounts.

/ / /

D.    *Plaintiffs' Casualty Loss*

Plaintiffs claimed a casualty loss of $10,000 on their 2012 Schedule A, for a deduction of $7,717.  (Def's Ex F at 3.)  Plaintiffs presented no evidence of the value of their house either before or after the flood.  The only evidence that Plaintiffs presented of flood damage was the expenses associated with the flood repairs, discussed above.  Defendant provided a property tax statement from the 2011-12 tax year reporting the house's real market value as $157,870 for the 2011-12 tax year, down from $179,470 for the prior tax year.  (Def's Ex D at 18.)  Skvarch testified that Plaintiffs failed to provide any records describing the flood, such as a newspaper article.  She disagreed that the flood was "sudden, unexpected, or unusual" as required by IRC section 165.  Skvarch testified that, in her view, the flood was due to a long-term maintenance issue rather than a catastrophic event qualifying as a casualty.

## II.  ANALYSIS

The issues presented are: (1) whether any of the expenses incurred by Plaintiffs for work on their rental property in 2011 and 2012 were repairs deductible under IRC section 162, rather than capital expenditures; (2) whether Plaintiffs should be allowed deductions for the 2011 and 2012 tax years for other expenses associated with their rental property, including a "work truck" and utilities; and (3) whether Plaintiffs should be allowed a casualty loss deduction for the 2012 tax year under IRC section 165(a) associated with a flood that occurred at their house.

The Oregon Legislature intended to "[m]ake the Oregon personal income tax law identical in effect to the provisions of the [IRC] relating to the measurement of taxable income of individuals, estates and trusts, modified as necessary by the state's jurisdiction to tax and the

/ / /

/ / /

revenue needs of the state[.]" ORS 316.007(1).[8] "Any term used in this chapter has the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required or the term is specifically defined in this chapter." ORS 316.012. On the issues presented in this case, "Oregon law makes no adjustments to the rules under [the IRC] and therefore, federal law governs the analysis." *See Porter v. Dept. of Rev.*, 20 OTR 30, 31 (2009).

Taxpayers must be prepared to produce "any books, papers, records or memoranda bearing upon [any] matter required to be included in the return[.]" ORS 314.425(1); *see also Gapikia v. Comm'r*, 81 TCM (CCH) 1488, WL 332038 at *2 (2001) ("[t]axpayers are required to maintain records sufficient to substantiate their claimed deductions"). Generally, if a claimed business expense is deductible, but the taxpayer is unable to substantiate it fully, the court is permitted to make an approximation of an allowable amount. *Cohan v. Comm'r (Cohan)*, 39 F2d 540, 543–44 (2nd Cir 1930). The estimate must have a reasonable evidentiary basis. *Vanicek v. Comm'r*, 85 TC 731, 743 (1985). IRC section 274(d) supersedes the *Cohan* rule and imposes more stringent substantiation requirements for travel, meals, entertainment, gifts, and listed property under IRC section 280F(d)(4). Treas Reg § 1.274-5T(a).

Deductions are "a matter of legislative grace" and taxpayers bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992). "In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief

---

[8] The court's references to the Oregon Revised Statutes (ORS) are to 2011. Although the 2009 ORS are applicable for the 2011 tax year, there is no material difference between the 2009 and 2011 versions of the ORS sections cited in this Decision.

* * *." ORS 305.427. Plaintiffs must establish their claim "by a preponderance of the evidence[,]" which "means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). "In an appeal to the Oregon Tax Court from an assessment made under ORS 305.265, the tax court has jurisdiction to determine the correct amount of deficiency * * *." ORS 305.575.

A.      *Deduction of Claimed Repair Expenses*

IRC sections 162 and 212 "generally permit taxpayers to deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business for the production of income." *Hailstock v. Comm'r*, 112 TCM (CCH) 200, WL 4183241 at *6 (2016). Ordinary and necessary expenses of renting a property may include repair expenses. *See* Treas Reg § 1.162-4. However, under IRC section 263(a)(1), "no deduction shall be allowed for * * * [a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." *See also Moss v. Comm'r (Moss)*, 831 F2d 833, 835 (9th Cir 1987), citing IRC §§ 162(a), 263(a)(1) ("Generally speaking, expenditures for ordinary and necessary repairs may be deducted in the year incurred, while expenditures for permanent improvements or betterments made to increase the value of any property must be capitalized and depreciated over the useful life of the improvement").

The applicable Treasury Regulation provides additional guidance on the distinction between repairs and capital improvements:

> "The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant,

equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept."

Treas Reg § 1.162-4.[9] Except as otherwise provided, no deduction is allowed for

"(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, or

"(2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made in the form of a deduction for depreciation, amortization, or depletion."

Treas Reg § 1.263(a)-1(a).[10] That regulation continues:

"In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures within the meaning of subparagraphs (1) and (2) of this paragraph."

Treas Reg § 1.263(a)-1(b). Capital expenditures include "[t]he cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year." Treas Reg § 1.263(a)-2(a).

The Ninth Circuit characterized the distinction between repairs and capital improvements as "the difference between 'keeping' and 'putting' a capital asset in good condition:

'The test which normally is to be applied is that if the improvements were made to 'put' the particular capital asset in efficient operating condition, then they are capital in nature. If, however, they were made merely to 'keep' the asset in efficient operating condition, then they are repairs and are deductible.'

*Moss*, 831 F2d at 835, citing *Estate of Walling v. Comm'r*, 373 F2d 190, 192–93 (3d Cir 1967).

---

[9] The quoted version of Treasury Regulation section 1.162-4 is that which was in effect as of the 2011 and 2012 tax years.

[10] The quoted version of Treasury Regulation section 1.263(a)-1 is that which was in effect as of the 2011 and 2012 tax years.

The proper characterization of expenditures depends on the context in which they are made. *Id.* at 835–36 (citations omitted). For instance, in the context where the taxpayer has erected a new building, "items of work which the contractor might have undertaken to prepare the building for occupancy such as carting away refuse or painting or even washing windows, could hardly be separated from the whole cost and deducted as expenses." *Stoeltzing v. Comm'r*, 266 F2d 374, 377 (3d Cir 1959).

"[A]n expenditure made for an item which is part of a 'general plan' of rehabilitation, modernization, and improvement of the property, must be capitalized, even though, standing alone, the item may appropriately be classified as one of repair." *U.S. v. Wehrli*, 400 F2d 686, 689 (10th Cir 1968).

> "Whether the plan exists, and whether a particular item is part of it, are usually questions of fact to be determined by the fact finder based upon a realistic appraisal of all the surrounding facts and circumstances, including, but not limited to, the purpose, nature, extent, and value of the work done, e.g., whether the work was done to suit the needs of an incoming tenant, or to adapt the property to a different use, or, in any event, whether what was done resulted in an appreciable enhancement of the property's value."

*Id.* at 690. The court in *Kaonis v. Comm'r )(Kaonis)*, declined to follow the rehabilitation doctrine with respect to expenditures associated with renovating a rental house. 37 TCM (CCH) 792 (1978), *aff'd mem.*, 639 F2d 788 (9th Cir 1981). The court disallowed current deductions for capital expenditures and replacements, including "additions to the existing structure, such as the patio, fence, gate, floor tile, window treatments, paneling, and light fixtures" and "bathroom fixtures and wash basins, tile, a stove, and certain other items." *Id.* However, the court allowed a current deduction for expenditures including "painting, cleaning and certain repairs to the property." *Id.* The court declined to follow the rehabilitation doctrine in that case because "the property was tenantable and generally suitable for its use in the trade or business." *Id.*

1.    *2011 tax year*

Plaintiffs conceded that the expenses associated with renovating the house and creating a rental unit – incurred in January and February – were capital expenditures. The court agrees with Plaintiffs that those expenses were capital expenditures because the effect of the work was to adapt the house to a new use; *i.e.*, as a rental unit within a structure that was formerly a single-family residence. Unlike in *Kaonis*, the house was not usable as a rental unit until Plaintiffs completed the renovations. Thus, other house-related expenses incurred in January and February 2011 must be capitalized. Plaintiffs conceded that expenses totaling $9,930 were capital expenditures. The court concludes that Plaintiffs' plumbing expenses totaling $2,337 incurred in February must also be capitalized as part of Plaintiffs' renovation.

The court finds that other expenses incurred by Plaintiffs had the effect of increasing the value of the house or extending its life. Specifically, expenses incurred to replace a bathtub in the rental unit; to bring the electrical wiring to code; and to replace the furnace were capital expenditures. The court finds that Plaintiffs incurred capital expenditures totaling $14,567 in 2011. Additionally, Plaintiffs conceded that expenses totaling $1,776 were for tools that should be depreciated over five years.

Plaintiffs presented evidence of expenses incurred to repair the roof of the house, resulting in about 15 to 20 percent of the roof being replaced. The repairs in 2011 were unsuccessful and Plaintiffs made further repairs in 2012. The court finds that the expenses Plaintiffs incurred in 2011 to repair the roof are deductible repairs. *See Farmers Creamery Co. of Fredericksburg, Va. v. Comm'r*, 14 TC 879, 880, 882–83 (1950) (allowing a current year repair deduction for structural repairs to a building that were necessary to "maintain and continue the efficient use of the building" and where "the repairs never replaced as much as one-half of

any wall, ceiling, or floor and they did not in any way enlarge or change the design of the building"). The court further finds that the following expenses incurred by Plaintiffs are deductible as repairs: dump expenses incurred after February; plumbing expenses incurred after February; expenses associated with cleaning up the yard; and new paint for the tenant. Those expenses, along with the roof repairs, totaled $4,518.

2. *2012 tax year*

Plaintiffs conceded that expenses totaling $6,336 were capital expenditures. The court finds that Plaintiffs' various expenses totaling $1,631 were capital expenditures rather than repairs, because Plaintiffs did not provide persuasive evidence concerning the work performed. Furthermore, some of those expenses were clearly capital expenditures, such as for a new deck. The court finds that Plaintiffs' capital expenditures totaled $7,967. Additionally, Plaintiffs conceded that expenses totaling $351 were for tools that should be depreciated over five years.

Plaintiffs presented evidence of flood-related repair expenses totaling $6,644. The court finds that Plaintiffs' expenses to remove flood water from the house and fix a crack in the driveway were repairs rather than capital expenditures because they returned the house to the state it was in before the flood. *See Schladweiler v. Comm'r*, 80 TCM (CCH) 681 (WL 1690282 at **5–6 (2000), citing *Plainfield-Union Water Co. v. Comm'r*, 39 TC 333, 337 (1962). Additionally, Plaintiffs presented evidence that they incurred expenses totaling $69 for disposable tools and tool repair.

B. *Other Deductions Associated with the Rental Property*

1. *Work truck*

As noted above, IRC section 274(d) imposes more stringent substantiation requirements for travel, meals, entertainment, gifts, and listed property under IRC section 280F(d)(4). Treas

Reg § 1.274-5T(a). Passenger automobiles are defined as "listed property" under IRC section 280F(d)(4) and are, therefore, subject to strict substantiation under IRC section 274(d). Certain "qualified nonpersonal use vehicles" are not subject to strict substantiation. Such vehicles include those which, by reason of their nature, are "not likely to be used more than a de minimis amount for personal purposes. IRC § 274(i).[11] Plaintiffs' "work truck" is a 1978 pickup truck. Plaintiffs presented no evidence that the truck is a "qualified nonpersonal use vehicle." Thus, Plaintiffs must substantiate their truck-related expenses in accordance with IRC section 274(d).

Under IRC section 274(d), Plaintiffs must substantiate "by adequate records or by sufficient evidence corroborating the taxpayer's own statement" the amount of their truck expenses; the time and place of their use of the truck; and the business purpose of their use of the truck. Plaintiffs presented proof of the amount of their truck expenses incurred in 2011. However, they failed to present evidence of their use of the truck besides Maynard's testimony that the truck was used solely for work related to the house. That testimony is insufficient under IRC section 274(d) without adequate records to corroborate it.

2.    *Utilities*

Plaintiffs failed to present any persuasive evidence of their utility expenses for either tax year. For each tax year at issue, Plaintiffs provided only a one-page document listing an amount paid for natural gas and an amount paid to PGE. Plaintiffs failed to provide any cancelled checks, invoices, or statements showing their utility payments. There is no evidence from which the court can make a reasonable estimation of Plaintiffs' utility expenses.

/ / /

---

[11] "Qualified nonpersonal use vehicles" include "clearly marked police and fire vehicles, ambulances, hearses, vehicles designed to carry cargo with a gross weight of more than 14,000 pounds, bucket trucks, cement mixers, combines, cranes, derricks, delivery trucks with seating only for the driver, dump trucks, flatbed trucks, forklifts, refrigerated trucks, school buses, tractors, and other special purpose farm vehicles." *Ewell v. Comm'r*, 71 TCM (CCH) 3134, WL 283684 at *11 (1996) (citation omitted).

C.    *Deduction for Casualty Loss*

IRC section 165(a) provides a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." For individuals, such losses are limited to:

"(1) losses incurred in a trade or business;

"(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

"(3) except as provided in subsection (h), losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft."

IRC § 165(c). An individual's casualty loss deduction is limited to the excess over $100 per casualty and to the excess over 10 percent of the individual's adjusted gross income per the total of personal casualty losses. IRC § 165(h).

To qualify as an "other casualty" under the code, the event must be "analogous to fire, storm, or shipwreck." Rev Rul 72-592, 1972-2 CB 101 (1972). The event must be "of a sudden, unexpected, and unusual nature." *Id.*

"To be 'sudden' the event must be one that is swift and precipitous and not gradual or progressive.

"To be 'unexpected' the event must be one that is ordinarily unanticipated that occurs without the intent of the one who suffers the loss.

"To be 'unusual' the event must be one that is extraordinary and nonrecurring, one that does not commonly occur during the activity in which the taxpayer was engaged when the destruction or damage occurred, and one that does not commonly occur in the ordinary course of day-to-day living of the taxpayer."

*Id.* "The progressive deterioration of property through a steadily operating cause is not a casualty." *Oliver v. Comm'r*, 73 TCM (CCH) 2035, WL 66769 at \*17 (1997) (citation omitted).

To establish the amount of the loss, "the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal."

Treas Reg § 1.165-7(a)(2)(i).  However, the appraisal must take into account the effect of any market decline that occurred simultaneously with the casualty.  *Id.*  The cost of repairs to the property damaged may be acceptable evidence of the loss of value.  Treas Reg § 1.165-7(a)(2)(ii).  However, the taxpayer must show the following:

> "(a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty."

*Id.*

The first question is whether the flood of Plaintiffs' house qualifies as a "casualty." According to Plaintiffs, the flood was due to "hydrostatic pressure" in the ground.  Maynard's testimony that many other homes in the area are affected by hydrostatic pressure suggests that resulting floods are not "unusual" events.  Plaintiffs provided no additional evidence concerning the flood, such as whether it was preceded by unusually heavy rainfall or whether other, nearby properties were unexpectedly flooded.  The U.S. Tax Court declined to find a casualty where the taxpayer reported "cracks and fissures in the wall and floor of the basement," explaining:

> "It is possible that excessive hydrostatic pressure under proper circumstances might rise to the stature of a casualty.  But, in view of the record, we need not decide that question.  In conclusion, the suggestion that the damage may have been caused by hydrostatic pressure will not suffice as proof of a casualty in this case."

*Dvorkovitz v. Comm'r*, 25 TCM (CCH) 43 (1967) (citation omitted).  Here, the court reaches the same conclusion.  Plaintiffs' limited evidence concerning the cause of the flood is insufficient to support a finding that the flood was due to a sudden, unexpected, and unusual event.

Because Plaintiffs failed to prove that the flood qualified as a casualty under IRC section 165(c), the court need not address whether Plaintiffs presented persuasive evidence of the loss

resulting from the flood. The court's conclusion here does not alter its conclusion that Plaintiffs may deduct expenses associated with repairing the rental unit after the flood.

III. CONCLUSION

After careful consideration, the court concludes that Plaintiffs are allowed a depreciation deduction for the 2011 tax year based on $14,567 in capital expenditures to improve the house and based on $1,776 in purchases of tools with a five-year useful life. Plaintiffs are allowed a deduction for the 2011 tax year based on $4,518 in expenses to repair the house. For the 2012 tax year, Plaintiffs are allowed a depreciation deduction based on $7,967 in capital expenditures to improve the house and based on $351 in purchases of tools with a five-year useful life. For the 2012 tax year, Plaintiffs are allowed deductions based on $6,644 in expenses to repair flood damage to the house and on $69 in expenses for tools with a one-year life and tool repair. Plaintiffs' house-related deductions are subject to an allocation of 50 percent for the rental unit and 50 percent for personal use. Plaintiffs' claimed deductions for utilities and vehicle expenses are disallowed for both the 2011 and 2012 tax years. Plaintiffs' claimed casualty loss deduction is disallowed for the 2012 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that, for the 2011 tax year, Plaintiffs are allowed a depreciation deduction based on $14,567 in capital expenditures to improve the house and based on $1,776 in purchases of tools with a five-year useful life. Plaintiffs are allowed a deduction based on $4,518 in expenses to repair the house.

IT IS FURTHER DECIDED that, for the 2012 tax year, Plaintiffs are allowed a depreciation deduction based on $7,967 in capital expenditures to improve the house and based on $351 in purchases of tools with a five-year useful life. Plaintiffs are allowed deductions

///

based on $6,644 in expenses to repair flood damage to the house and on $69 in expenses for tools with a one-year life and tool repair.

IT IS FURTHER DECIDED that, for the 2011 and 2012 tax years, Plaintiffs' house-related deductions are subject to an allocation of 50 percent for the rental unit and 50 percent for personal use.

IT IS FURTHER DECIDED that, for the 2011 and 2012 tax years, Plaintiffs' claimed deductions for utilities and vehicle expenses are disallowed.

Dated this ____ day of September, 2017.


_____
ALLISON R. BOOMER
MAGISTRATE

***If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.***

***This document was signed by Magistrate Boomer and entered on September 19, 2017.***